**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC.,<br><br>*Plaintiff*,<br><br>vs.<br><br>RG ANESTHESIA, LLC,<br><br>*Defendant*. | Case No.<br><br>**COMPLAINT** |

Plaintiff United Healthcare Services, Inc. ("United") hereby alleges as follows for its complaint against Defendant RG Anesthesia, LLC ("RG Anesthesia").

## INTRODUCTION

1. Defendant has weaponized a federal law intended to shield commercially insured patients from surprise out-of-network medical bills, transforming it into a vehicle to obtain a windfall. The federal No Surprises Act ("NSA") was designed to establish a fair and balanced process—called Independent Dispute Resolution ("IDR")—for determining out-of-network reimbursement rates for services performed by certain medical providers. Congress's goals were clear: protect patients, encourage equitable payments between out-of-network providers and commercial health plans, and rein in soaring healthcare costs. Crucially, only claims related to commercial insurance plans are eligible for this process; Medicare- and Medicaid-related claims (for which patients are already protected from surprise bills) are ineligible.

2. RG Anesthesia, however, is abusing the NSA by knowingly and illegally submitting ineligible claims to the IDR process, securing excessive, windfall awards to which it has no legitimate right. This scheme has nothing to do with seeking fair payment but rather is about attempting to funnel outsized profits into the pockets of its corporate owners, all at the expense of United and the Medicare and Medicaid programs.

3. Congress enacted the NSA with a clear purpose: to establish an independent system to resolve payment disputes in a manner that is "fair to both providers and plans that also does not increase aggregate healthcare system costs."[1] Yet, the NSA's IDR process is now being used as a tool for exploitation by certain unethical provider groups and, in some instances, the private equity investors that have acquired them. Those provider groups and their billing companies have manipulated the process, securing massive awards—oftentimes many times in excess of the government-mandated rates, as detailed herein—for claims that were, at all times, outside the scope and jurisdiction of the NSA's IDR process.

4. Here, RG Anesthesia committed fraud by knowingly providing false certifications to United, the NSA IDR entities ("IDREs"), and the U.S. Department of Health & Human Services ("HHS") that "the item(s) and/or service(s) at issue [we]re qualified item(s) and/or service(s) within the scope of the Federal IDR process." It did so with full knowledge that the claim described herein was ineligible for the NSA's IDR process because, among other things, United's Provider Remittance Advice clearly and unequivocally informed RG Anesthesia that the claim at issue was for a patient covered under a Medicare Advantage plan.

---

[1] *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act*, (Issue Brief No. HP-2021-24), Off. of the Ass't Sec'y for Planning & Evaluation, U.S. Dep't of Health & Human Servs., (Nov. 22, 2021), http://resource.nlm.nih.gov/9918539088506676.

5. RG Anesthesia and its affiliated entities have initiated dozens of disputes against United, including disputes that were ineligible for NSA IDR, like the claim described herein. Defendant's abuse of the NSA IDR process is fraudulent, egregious, and intentionally designed to undermine the very integrity of the protections Congress intended to create.

6. United brings this action to put an end to RG Anesthesia's exploitation of the NSA IDR process.

## PARTIES

7. Plaintiff United is a corporation organized under the laws of the State of Delaware, with its principal place of business in Minnesota. Through its subsidiaries, including UnitedHealthcare Insurance Company and Care Improvement South Central Insurance Company, United is contracted with the federal government to offer Medicare Advantage plans.

8. Defendant RG Anesthesia is a limited liability company organized under the laws of Georgia, with its principal office at 3414 Peachtree Rd. N.E., Suite 340, Atlanta, GA. Under the National Provider Identifier Registry, RG Anesthesia's primary practice address is identified as 11 John Maddox Dr. NW, Rome, GA

30165-1413.[2] On information and belief, RG Anesthesia is affiliated with CRH Medical Corporation, a national healthcare products and services company.

## JURISDICTION AND VENUE

9. This Court has federal question subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because resolution of the claims in this Complaint raises disputed and substantial questions under the NSA, a federal statute, and will require judicial interpretation of the NSA.

10. This Court has general jurisdiction over Defendant because it maintains an active business registration in the State of Georgia and it regularly conducts business in Georgia.

11. This Court has specific jurisdiction over Defendant because this dispute arises out of, relates to, and has a substantial connection with Defendant's actions in this State. RG Anesthesia purposefully availed itself of this forum when it submitted claims for payment for services provided (a) to a Georgia resident, (b) in the State of Georgia, and (c) to an individual covered by a Georgia-based Medicare Advantage plan.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because (a) a substantial portion of the events giving rise to the claims herein occurred within

---

[2] *National Plan and Provider Enumeration System (NPPES) National Provider Identifier Registry,* (last visited Jan. 2, 2026), https://npiregistry.cms.hhs.gov/provider-view/1235553421.

this District; and (b) the Defendant is subject to this Court's personal jurisdiction with respect to this Complaint.

## FACTUAL ALLEGATIONS

### I. BACKGROUND

13. In order to fully appreciate the origin and intent of the NSA, one must first understand the different types of health insurance plans offered in America, the process by which medical providers are typically paid for their services, and the ways in which "out-of-network" providers like RG Anesthesia have historically manipulated the system through surprise medical bills that drive up healthcare costs for Americans.

#### A. Types of Health Insurance Plans

14. Over 90% of Americans maintain some form of health insurance to help cover the costs associated with the medical care they receive from healthcare providers.

15. There are three general categories of health insurance: private commercial plans, Medicare plans, and Medicaid plans.

##### 1) Private Commercial Health Insurance Plans

16. United and its affiliates provide healthcare insurance, administration, and/or benefits pursuant to group and individual commercial plans. These commercial plans are privately-funded either directly by United ("fully-insured" individual or group plans) or by employers who wish to offer commercial health

insurance for their employees and their families ("self-funded employer sponsored" group plans).

17. Notably, it is ***only*** claims submitted to and paid by qualifying commercial health plans that are eligible for the NSA's IDR process.[3]

**2) Medicare and Medicare Advantage Plans**

18. Medicare is a federally-funded health insurance program managed by the Centers for Medicare & Medicaid Services ("CMS") within HHS.

19. Medicare-eligible individuals may select from two primary forms of Medicare coverage. First, there are Medicare Parts A and B, which are managed directly by CMS. Second, Medicare-eligible individuals can alternatively elect to participate in Medicare Part C, also known as "Medicare Advantage." That program was enacted by the federal government to allow Medicare Advantage Organizations ("MAOs") like United, who are pre-approved by CMS, to provide insurance coverage for Medicare beneficiaries who choose to enroll in a privately administered Medicare Advantage plan.

20. United contracts with CMS to administer its Medicare Advantage program in exchange for a fixed per-member-per-month fee. In exchange for this fixed per-member-per-month fee, United agrees to take financial responsibility for

---

[3] *See* 42 U.S.C. §§ 300gg-111(c)(1)(A)-(B) (providing that IDR may be initiated with respect to a "group health plan or health insurance issuer offering group or individual health insurance coverage").

the cost of care required for its Medicare Advantage plan members in a given year. When a covered individual receives out-of-network medical services, United makes payments to the healthcare providers using these funds in accordance with CMS's Medicare fee schedules governing rates of payment to providers.

21. Because CMS sets the rules and regulations governing Medicare—including those related to payment and dispute resolution—for both traditional Medicare (Parts A and B) and Medicare Advantage (Part C), the NSA's IDR process does not apply to Medicare-related claims.[4]

22. In Georgia, the Medicare Advantage program provides access to healthcare for over one million people,[5] including individuals over the age of 65 and certain qualifying adults with disabilities.[6]

---

[4] "The Federal IDR process does not apply to items and services payable by Medicare, Medicaid, the Children's Health Insurance Program, or TRICARE." *Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process*, Centers for Medicare & Medicaid Services (updated Jan. 13, 2023), https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf.

[5] There are some categories of individuals who may be eligible for Medicare prior to the age of 65, such as individuals with a qualifying disability (e.g., end-stage renal disease or amyotrophic lateral sclerosis) or individuals receiving social security disability insurance benefits for 24 months.

[6] *MA Enrollment by SCC 2025*, Centers for Medicare & Medicaid Services (last visited December 30, 2025), https://www.cms.gov/data-research/statistics-trends-and-reports/medicare-advantagepart-d-contract-and-enrollment-data/monthly-ma-enrollment-state/county/contract/ma-enrollment-scc-2025-12

**3) Medicaid and Managed Medicaid Plans**

23. The Medicaid program is a jointly funded federal and state program that generally provides health insurance to low-income state residents who meet certain eligibility criteria. While each state operates its own state-based Medicaid program, the federal government (through CMS) provides funding to the states for those programs. Some states manage and administer their own Medicaid plans. Many other states contract with private managed care organizations ("MCOs"), such as United, who agree to provide coverage under privately managed Medicaid plans, similar to the Medicare Advantage program described above.

24. When providers enroll as Medicaid providers, they generally must agree to accept a State's mandated rates for services provided to Medicaid beneficiaries.[7] For these reasons, the NSA IDR process is inapplicable to Medicaid-related claims.[8]

**B. The Billing and Payment Process**

25. As demonstrated above, there are different categories of insurance plans (commercial, Medicare Advantage, or managed Medicaid), each with a variety of different benefit designs. For example, while one health plan may fully cover a

[7] 42 C.F.R. § 447.15 (limiting "participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the [Medicaid] agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual").

[8] *See* Note 4, *supra*.

certain procedure, another health plan may have only limited coverage or no coverage at all. Given this variability, it is important for providers to obtain and verify a patient's insurance information, typically through the patient's insurance card. Among other things, the insurance card identifies which insurance plan should be billed for the healthcare services and what category of insurance the patient has (i.e., commercial, Medicare Advantage, or managed Medicaid). Healthcare professionals rely on this information to bill for the care they provide. Indeed, it is why patients are asked to show their ID and health insurance card when they check in at a provider's office for medical care.

26. After they provide medical services to patients, providers submit claims for payment to health insurers on standardized claim forms. Today, these claim forms are usually submitted electronically. Claim forms include, among other items, specific information about the patient, the medical provider who rendered the care at issue, the healthcare services provided, and the amount charged by the provider.

27. The patient's insurer then processes the claim by first determining whether the patient is a member of one of the benefit plans offered by the insurer. If the patient has coverage under one of the insurer's plans, the insurer assesses the benefits available through the patient's specific insurance plan for the services at issue. Based on the terms of the patient's specific plan, the insurer makes a determination about whether the claim is covered, how much of the claim, if any,

must be paid by the patient (for example, a patient might be responsible for copays, coinsurance, and/or the full cost of services if she has not yet met her annual deductible), and how much the health plan will ultimately pay for the patient's care.

28. After the health insurer makes these coverage and payment determinations, the insurer issues an Explanation of Benefits ("EOB") to the patient and a Provider Remittance Advice ("PRA") to the medical provider. The EOB and PRA explain to the patient and the provider, respectively, how the specific claim was processed and paid. Both the EOB and PRA identify the amount billed by the provider, the amount allowed by the health plan based on the benefits available under the patient's specific insurance plan, the amount paid by the patient's plan, the amount owed by the patient, and the reasoning for the insurer's payment determination.

### C. Out-of-Network Providers' Calculated Abuse of the Billing and Payment Process

29. In most cases the aforementioned billing and payment process is predictable for providers and affordable for patients.

30. Patients with commercial insurance plans usually receive care from medical providers who have agreed on predetermined rates with insurance companies. Specifically, for their commercial insurance plans, United and its affiliates negotiate set rates for care provided by a broad network of credentialed healthcare professionals who offer United's commercial plan members quality,

affordable healthcare services. Healthcare providers who are part of United's network are called "in-network" providers. In-network providers enter into agreements with United that, among other things, govern the amount that United and United's commercial plan members will pay for healthcare services. When a United member receives services from an in-network provider, the provider is prohibited from billing above the predetermined network rate. As a result, the billing and payment process is predictable; in-network providers must accept the predetermined network rates without billing patients for any additional amounts.

31. However, there are certain medical providers, known as "out-of-network" providers, who have not entered into an agreement with United. United has not performed credentialing on these providers, nor has it agreed to pay these providers any predetermined amount for services rendered to commercially insured patients.

32. Fortunately, commercially insured patients can generally avoid the unpredictable costs associated with out-of-network providers. Patients most often seek out and receive services from medical providers who are in-network with their health insurance plans. And in the rare instance where a patient does seek care from an out-of-network provider, it is almost always by choice and with knowledge of the costs and complications involved with out-of-network care.

33. But in some situations, patients have no ability to control who provides their medical care. For instance, a patient may carefully schedule her surgery with an in-network surgeon at an in-network hospital but be unaware that the hospital staffs its operating rooms with independent contractor anesthesiologists and radiologists who have refused to enter into network agreements with health insurance companies like United. In this scenario, the patient reasonably (though incorrectly) assumes that all healthcare professionals working at the in-network hospital are also in-network with her insurance plan. The patient has no way of knowing that the anesthesiologist and radiologist involved in her surgery are out-of-network until it is too late.

34. Out-of-network providers are not limited in the amounts that they can charge for medical services provided to commercial health plan members; they generally set their rates however they want and without any logical connection to (a) their actual costs for delivering care, or (b) prevailing market rates and competitive dynamics.

35. Out-of-network providers know, however, that the patient's commercial health insurance plan is not obligated to pay their full billed charges. Rather, payments for out-of-network services are governed by the terms of the patient's specific commercial insurance plan. The out-of-network reimbursement varies from plan to plan—while some pay a percentage of the applicable Medicare

or Medicaid rate, others pay the average in-network rate for a given market, and yet others pay a percentage of the provider's billed charges.

36. Despite knowing that commercial health insurance plans will not pay their full billed charges, out-of-network providers routinely submit astronomically high bills to commercial health insurance plans. Insurers process out-of-network provider bills in accordance with the terms of the patient's specific commercial insurance plan, which results in a payment that is less than the amount of the out-of-network provider's full billed charge. This results in a "balance" that is left unpaid.

37. Historically, out-of-network providers would often "balance bill" commercially insured patients for the difference between their charged amount and the amount the commercial health plan allowed. From the patient's perspective, this bill came as a surprise, hence the term "surprise billing" (the balance/surprise bill was in addition to the amount the health insurance plan covered and any amounts the patient had already paid in copays, coinsurance and/or deductible).

## II. CONGRESS PASSED THE NO SURPRISES ACT TO REIN IN BILLING ABUSES BY OUT-OF-NETWORK PROVIDERS LIKE DEFENDANT

38. Congress recognized that providers like RG Anesthesia (whose out-of-network clinicians provide anesthesia services to patients receiving surgical procedures who do not have the ability to research the provider's network status before encountering the clinicians at surgery) held "substantial market power" and

"face[d] highly inelastic demands for their services because patients lack[ed] the ability to meaningfully choose or refuse care. . . ."[9] Thus, providers like RG Anesthesia could "charge amounts for their services that . . . result[] in compensation far above what is needed to sustain their practice."[10] Congress noted that this "market failure" was having "devastating financial impacts on Americans and their ability to afford needed health care."[11]

39. Congress enacted the NSA, effective January 1, 2022, "to protect consumers from surprise medical bills."[12] The NSA prohibits certain out-of-network healthcare providers—including emergency services providers and facilities, providers of non-emergency services operating at in-network facilities, and air ambulance providers—from engaging in surprise billing to members of private commercial health plans.[13]

40. Congress believed "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes."[14] Through passage of the legislation, Congress required healthcare providers (including hospitals and doctors) and payors (including

---

[9] Ban Surprise Billing Act, H.R. Rep. No. 116-615 (2020), at 53.
[10] *Id.*
[11] *Id.* at 52-53.
[12] *Id.* at 47.
[13] *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135.
[14] H.R. Rep. No. 116-615, at 55.

insurance companies and self-funded employer sponsored plans) to attempt to resolve billing and payment disputes amongst themselves.[15]

41. Thus, as part of the NSA, Congress created a specific framework for health plans and providers to resolve specific types of ***eligible*** surprise billing disputes.[16] That framework, called IDR, was designed to establish a fair and balanced process for determining out-of-network reimbursement rates from commercial health plans for enumerated types of out-of-network services.

**A. The NSA's IDR Process**

42. If an out-of-network provider disputes the initial payment received from a commercial health plan, the parties are first required to participate in a 30-business-day "open negotiation" to try and resolve the dispute. Should that fail, either party has four business days to commence IDR, seeking a binding payment determination from a certified IDRE.

43. For valid, eligible commercial insurance claims, the IDR process is a binding "baseball-style" dispute resolution. The NSA requires the provider and insurer to each submit a proposed reimbursement amount and explanation to the

[15] *See* Kevin Brady, *Brady Opening Statement at Full Committee Markup of Health Legislation*, H. Comm. on Ways & Means (Feb. 12, 2020), https://waysandmeans.house.gov/2020/02/12/brady-opening-statement-at-full-committee-markup-of-health-legislation-3/.
[16] *See* 42 U.S.C. § 300gg-111(c).

IDRE.[17] The IDRE then selects one of the two proposed amounts, taking into account various criteria.[18] One of these criteria is the qualifying payment amount ("QPA"), which is a calculation that represents the median in-network rate for a given service rendered by the same or similar medical provider in a given region. Congress expected that most items and services submitted to IDR would be paid at or around the QPA. Indeed, Congress' intent was to make the QPA a key metric in the NSA IDR process as opposed to an out-of-network provider's "billed charges," because Congress recognized that the out-of-network providers' billed charges were arbitrary amounts with no relation to the amounts health plans or individuals usually paid for the same services.[19]

44. Congress intended that this system would function in a manner that was "fair to both providers and plans [and] that also does not increase aggregate healthcare system costs."[20] It also intended that the IDR system would be used ***relatively infrequently***. In the regulations establishing the IDR system, federal agencies estimated that the IDR process would annually resolve 17,333 disputes.[21]

---

[17] 42 U.S.C. § 300gg-111(c)(5)(B).
[18] *Id*. § 300gg-111(c)(5)(C)(i).
[19] *See* Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. 55980, 55996 (Oct. 7, 2021) (median contracted rates typically represent reasonable market values because they "are established through arms-length negotiations between providers and facilities and plans and issuers (or their service providers).")
[20] *See* Note 1, *supra*.
[21] *See* Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. 55980, 56066, 56069 (Oct. 7, 2021).

The reality, though, has been very different.

### B. Out-of-Network Providers Intentionally Abuse the IDR Process and Thwart Congressional Intent

45. To say that out-of-network providers have filed far more IDR cases than anticipated would be a gross understatement. In only the first nine months after the IDR system opened in 2022, about 190,000 disputes were filed—more than ***ten times*** the number expected for the first full year alone.[22] The number of claims submitted to IDR has only increased. From mid-2022 to May 2025, more than ***3.3 million*** disputes were filed.[23] Large medical staffing provider groups, often backed by private equity, were responsible for filing a majority of these disputes.[24] And far from leading to fair outcomes, the IDR process has been incredibly biased in favor of out-of-network providers. In 2024, for example, IDREs sided with out-of-network providers in 85% of claims decided.[25]

46. Not only do IDREs side with providers most of the time, but when they do, they almost always issue awards that are ***many times*** the QPA that Congress

---

[22] *See* Jack Hoadley and Kennah Watts, *The Substantial Costs Of The No Surprises Act Arbitration Process,* HealthAffairs (Aug. 25, 2025), https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process.

[23] *Id.*

[24] *See Profiting on all Sides: Private Equity and the No Surprises Act*, Private Equity Stakeholder Project (Nov. 5, 2025), https://pestakeholder.org/news/profiting-on-all-sides-private-equity-and-the-no-surprises-act/.

[25] *Id.*

expected would prevail in most IDR proceedings. In the fourth quarter of 2024, the median amount awarded by IDREs was 459% of the QPA.[26]

47. Far from reining in soaring healthcare costs as Congress intended, the unforeseen volume of claim submissions and the outsized awards IDREs have routinely issued in favor of providers have had dramatic monetary costs for the healthcare system and patients. Ironically, the NSA IDR system has ***added at least $5 billion*** to overall health system costs since its inception—approximately $2 to $2.5 billion per year.[27]

### C. Out-of-Network Providers Like Defendant Have Routinely Submitted Ineligible Medicare and Medicaid Claims to the NSA IDR Process

48. One of the many things Congress did not foresee in enacting the NSA was that providers like RG Anesthesia would purposefully, fraudulently, and in violation of federal law submit clearly ineligible claims to IDR. Nor could Congress have foreseen that IDREs (who are certified by CMS and should, therefore, be able to readily distinguish between an eligible commercial insurance claim and an ineligible Medicare or Medicaid claim) would blatantly ignore evidence of ineligibility, routinely exceed their jurisdiction, and issue 85% of decisions in favor of providers at amounts that are four hundred percent or more of the QPA that

---

[26] *See* Jack Hoadley and Kennah Watts, *The Substantial Costs Of The No Surprises Act Arbitration Process*, *supra* note 22.
[27] *Id.*

Congress intended would prevail in most disputes. Unfortunately, the NSA IDR system has perverse financial incentives that encourage providers to submit, and IDREs to improperly accept, ineligible claims. In fact, current data shows that ineligible claims constitute about 20% of all closed IDR disputes.[28]

49. This is a clear violation of the NSA. The IDR process is not available for services provided to patients covered by Medicare- or Medicaid-related plans. Rather, the process only applies to services furnished to patients covered by a private commercial "group health plan or health insurance issuer offering group or individual health insurance coverage."[29]

50. This fact could not come as a surprise to any healthcare provider or IDRE. Indeed, CMS—the federal agency that is primarily charged with administering the IDR process—has issued several resources to aid parties in determining whether a claim is eligible for IDR. These resources clearly explain that "[t]he Federal IDR process ***does not apply*** to items and services payable by Medicare, Medicaid, the Children's Health Insurance Program, or TRICARE."[30]

51. Notwithstanding the clear limits of the NSA IDR process, out-of-network providers like RG Anesthesia continue to fraudulently submit ineligible

---

[28] *Id.*
[29] 42 U.S.C. §§ 300gg-111(c)(1)(A)-(B).
[30] *See, e.g.*, *Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process*, Centers for Medicare & Medicaid Services (Jan. 13, 2023), *supra* note 4.

Medicare- and Medicaid-related claims in hopes of scoring exorbitant recoveries.

## III. DEFENDANT FRAUDULENTLY SUBMITTED AN INELIGIBLE MEDICARE CLAIM TO THE NSA IDR PROCESS

52. The following example is emblematic of Defendant's fraudulent abuse of the NSA IDR process.

53. On January 17, 2025, a 74-year-old patient underwent a lower intestinal endoscopy procedure at the Rome Endoscopy Center in Rome, Georgia ("Rome Endoscopy"). This patient was insured through a United-administered Medicare Advantage plan.

54. When a Medicare recipient receives medical care, they have to show the medical provider their insurance card. The card for the aforementioned patient would have looked substantially similar to the following, with a line clearly identifying the patient as a Medicare Advantage plan enrollee:




55. While at Rome Endoscopy, the patient received services from an RG Anesthesia-affiliated anesthesiologist.

56. Upon information and belief, RG Anesthesia handles its own billing and submits claims for reimbursement on its own behalf to United. Because RG Anesthesia has a relationship with Rome Endoscopy to provide anesthesia services to admitted patients, RG Anesthesia should have received the patient's insurance information from Rome Endoscopy and, therefore, should have known that the patient was insured under a Medicare Advantage plan.

57. On May 3, 2025, RG Anesthesia submitted a claim to United for the anesthesia services provided to the patient. The total charged amount for the anesthesia services was $1,440.[31]

58. Upon receiving the claim, United determined that the patient was a member of its Medicare Advantage plan. Accordingly, United calculated the government-mandated reimbursement amount for the anesthesia services provided to Medicare Advantage patients, which was $96.43.

59. Specifically, United calculated the appropriate payment for this claim according to CMS's fee schedule. Payment for anesthesia claims is calculated by looking up the Current Procedural Terminology ("CPT") code for the service.[32] CPT

---

[31] RG Anesthesia's claim actually totaled $1,920.00 because RG Anesthesia improperly submitted a separate line item for CPT code 99100. Per CMS rules, CPT code 99100 generally cannot be billed separately from the underlying anesthesia services. Consequently, United denied this line item as an improper "unbundled service."

[32] CY 2026 Payment Policies Under the Physician Fee Schedule, 90 Fed. Reg. 49266, 49268 (Nov. 5, 2025)

codes are a uniform nomenclature developed by the American Medical Association for coding medical procedures and services.[33] They are five-digit, numerical codes that communicate what medical services were provided to the patient. When providers submit claims for reimbursement to United, they include the CPT code, which United then uses to determine the appropriate reimbursement rate for that service under the Medicare fee schedule. In this case, the CPT code was 00812.

60. On May 23, 2025, United paid RG Anesthesia $94.51 (the government mandated allowed amount of $96.43 minus $1.92 sequestered pursuant to the mandatory 2% Medicare Sequestration Payment Reduction[34]). With its payment, United sent RG Anesthesia a PRA providing details on the patient, the patient's status as a member of a Medicare Advantage plan, the claim, and United's reimbursement:

[33] *CPT Codes*, American Medical Association (last visited Jan. 1, 2026), https://www.ama-assn.org/topics/cpt-codes

[34] *Medicare and Budget Sequestration* (last visited Jan. 2, 2026), https://www.congress.gov/crs-product/R45106.

**PROVIDER REMITTANCE ADVICE**

| CHECK DATE | REF # 2295 |
|---|---|
| 05/23/25 | HHA C01 001 806 |

PROV NO. 0020-0100254NAME RG ANESTHESIA LLC UPIN NO. PLZ SUBMIT

**MEMBER** REDACTED **NUMBER** REDACTED **ACCOUNT NO.** REDACTED

CLAIM NO. NTL 63180861-00
DIAG Z1211 Z860100 K621
MSG CODES: P001
REND PROV ID 1245362367

PCP NAME COLLINS JR, M.D., JAMES ERNEST PCP NO.00010004994

| DOS | PROC | U | CLAIMED | MEM RESP | DEDUCT | INELIG-MEM | INELIG-PROV | CODE | DISCOUNT | SEQSTR | AMOUNT PAID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/17/25 | 99100 | 01 | 480.00 | | | | 480.00 | 0807 | | | .00 |
| 01/17/25 | 00812QZP2 | 27 | 1440.00 | | | | 1343.57 | 0176 | | 1.92 | 94.51 |
| CLAIM TOTAL | | | 1920.00 | | | | 1823.57 | | | 1.92 | 94.51 |

61. The PRA was printed on letterhead labeled "UnitedHealthcare Medicare Solutions," indicating that it was a United-managed Medicare Advantage plan.

62. The PRA also contained an "ineligible explanation code" explaining why United had paid the amount it did for this patient's services. The code in this case was 0176, which reflects, as stated on the PRA, that the patient was a Medicare patient ("Medicare allowed/don't bill member").

63. The PRA also provided RG Anesthesia with detailed procedures to appeal United's payment. These procedures provided, in part, that "[p]ursuant to federal regulations governing the Medicare Advantage program, non-contracted providers may request reconsideration (appeal) of a Medicare Advantage plan payment denial determination. To appeal a claim denial, submit a written request

within 65 calendar days of the remittance notification date and include at a minimum" certain documentation.

64. In addition to the appeals process, the PRA also provided detailed procedures to submit a payment dispute stating, "[p]ursuant to federal regulations governing the Medicare Advantage program, non-contracted providers may file a payment dispute for a Medicare Advantage plan payment determination." These procedures provided, in part, that "[a] payment dispute may be filed when the provider disagrees with the amount paid" and "[n]on-contracted care provider claim payment disputes include any payment in which a non-contracted Medicare health plan care provider contends the amount paid by the Plan for a Medicare covered service is less than the amount that would have been paid under Original Medicare."

65. RG Anesthesia never appealed United's payment on the claim or sought reconsideration.

66. Even though the insurance card and PRA clearly showed that the patient was a member of a Medicare Advantage plan and therefore ineligible for the NSA IDR process, on August 12, 2025, RG Anesthesia initiated an IDR dispute through its agent Radix Health ("Radix").

67. Radix is a healthcare software entity with corporate offices in New York City and Santa Monica, California, specializing in NSA disputes. Radix's website characterizes Radix as "a passionate team committed to fighting on behalf

of providers to bring market-based pricing to healthcare."[35] Radix works for providers like RG Anesthesia for a contingent fee.[36] Providers, like RG Anesthesia, using Radix's services submit the dispute in the IDR process through Radix's portal. As part of that process, Radix represents that it "combines Silicon Valley software engineering with deep healthcare expertise, unlocking a seamless and transparent way for providers to embrace the new out-of-network landscape."[37]

68. RG Anesthesia, through Radix, initiated the IDR proceeding via an online federal web portal that includes a notice that providers must submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process."

---

[35] *About Us*, Radix.io, https://radixhealth.io/about (last visited Jan. 1, 2026)
[36] *Emergency Medicine IDR Solutions*, https://radixhealth.io/who-we-serve/emergency-idr-solutions (last visited Jan. 1, 2026).
[37] *What is Radix*, Radix.io, https://radixhealth.io/#what-is-radix (last visited Dec. 17, 2025).

**Along with the general information you'll need to start your Federal IDR dispute process, provide:**

- Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
- Dates and location of qualified IDR items or services
- Type of qualified IDR items or services such as emergency services and post-stabilization services
- Codes for corresponding service and place-of-service
- Attestation that qualified IDR items or services are within the scope of the Federal IDR process
- Your preferred certified IDR entity

69. RG Anesthesia, through Radix, sought $1,248.75 for the disputed claim. In initiating the dispute at issue here, RG Anesthesia, through Radix, fraudulently attested that "the item(s) and/or services at issue [we]re qualified item(s) and/or service(s) ***within the scope of the Federal IDR process.***" (emphasis added).

**Third Party Attestation:**
Yes

**Conflict of Interest Attestation**

☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

**Signature:** Josh Folds

**Date:** 08/12/2025

### A. United Objected to RG Anesthesia's Submission of the Ineligible Claim

70. On August 14, 2025, United responded by attesting that the claim was "***not eligible for IDR under the NSA*** because this Member is enrolled in [] Medicare." (emphasis added).

> **Federal IDR Process Applicability Attestation**
>
> I (We), the undersigned non-initiating party, attest that the Federal IDR process is NOT applicable to the items and services under dispute.
>
> **If you attested to this statement, select one or more justifications to support why the items and services under dispute do not belong in the Federal IDR Process.**
>
> ☑ This dispute includes items or services under a coverage type not subject to the No Surprises Act.
>
> *** Which items or services are under a coverage type not subject to the NSA and what coverage type(s) is the item or service under?**
>
> Claim No(s). NTL6318086 are not eligible for IDR under the NSA because this Member is enrolled in a Medicare.
>
> **Additional information to justify your selection:**
>
> **Non-Initiating party:** UnitedHealthcare
>
> **Date:** 08/14/2025

71. On September 13, 2025, United sent a letter to the selected IDRE, Keystone Peer Review Organization, Inc. ("Keystone"), reiterating that the claim was "not eligible" for IDR adjudication because "this Member is enrolled in [] Medicare."

72. To this September 13 letter, United attached the PRA for the claim, which (as discussed in paragraphs ¶¶ 60-66, *supra*) made clear that the services were provided to a patient insured under a Medicare Advantage plan.

United Healthcare

09/13/2025

IDR File Number: DISP-3833536
Provider/Facility: RG Anesthesia LLC (Provider)

Dear Keystone Peer Review Organization, Inc.,

We appreciate your engagement with this matter. As a preliminary matter, we believe that this dispute is not eligible for the Federal Independent Dispute Resolution (IDR) program under the No Surprises Act (NSA).

**The Provider's Claims Are Ineligible for IDR under the NSA**

The claim(s) below do not qualify for the Federal IDR program under the NSA for the following reason(s).

> Claim No(s). NTL6318086100 are not eligible for IDR under the NSA because this Member is enrolled in a Medicare plan.

* * *

***For the reasons set forth above, we respectfully request that the IDRE determine that this dispute is ineligible for IDR. We also respectfully request that the IDRE determine that, as the prevailing party, we are entitled to a refund of the IDRE fees it paid in connection with this dispute.***

We thank you for your time and assistance with this matter.

Respectfully submitted,

UNITEDHEALTHCARE

__________________

### B. The IDRE Improperly Accepted the Ineligible Claim and Entered a Decision in Defendant's Favor

73. On September 29, 2025, after allegedly "considering all permissible information submitted by both parties," the IDRE inexplicably determined the claim in favor of RG Anesthesia and ordered United to pay RG Anesthesia the full amount sought, $1,248.75—***$1,152.32 more than the CMS-mandated Medicare rate that RG Anesthesia was required to accept for treating the Medicare member at issue.***

74. The IDRE made no explicit determination that the claim was eligible for IDR resolution.

75. The IDRE noted that United submitted "a statement that the dispute is ineligible for the Federal Independent Dispute Resolution (IDR) program under the No Surprises Act (NSA)" but provided no response or further acknowledgement of United's (correct) contention.

76. After the IDRE issued its $1,248.75 determination, United filed a complaint with the federal No Surprises Help Desk requesting that the IDRE's determination be overturned. United's complaint enclosed the PRA as proof of ineligibility. These efforts—United's August and September objections and subsequent complaint—placed the IDRE on repeated notice of the claim's ineligible status and the IDRE's resulting lack of jurisdiction over the claim.

**1) The IDRE Never Had Any Jurisdiction Over the Claim Submitted by Defendant**

77. IDREs like Keystone must be certified by CMS and, as part of that certification process, must "[d]emonstrate ***expertise*** in . . . [a]rbitration and claims administration[,] managed care[,] billing and coding[,] medical[,] [and] legal (including healthcare law)."[38]

---

[38] *Apply to Become a Certified Independent Dispute Resolution Entity*, Centers for Medicare & Medicaid Services, https://www.cms.gov/nosurprises/help-resolve-payment-disputes/apply (last visited Jan. 1, 2026) (emphasis added).

78. HHS, the Department of Labor, and the Department of the Treasury (the "Departments") have issued guidance to IDREs titled "Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities." The most recent December 2023 Guidance directs: "In addition to checking for and submitting an attestation regarding conflicts of interest, the **certified IDR entity must determine whether the Federal IDR Process applies to the items and services that are the subject of the dispute**. The Federal IDR process **does not apply** to items and services payable by Medicare, Medicaid, the Children's Health Insurance Program, or TRICARE."[39]

79. Given that their authority and jurisdiction necessarily derive from the NSA and is, therefore, necessarily limited to only eligible disputes related to commercial insurance claims, IDREs are required by regulation to "determine whether the Federal IDR process applies" ***before*** proceeding with a claim.[40]

80. Only after an IDRE satisfies its statutory obligation to determine whether a claim is eligible for the IDR process and within its jurisdiction can an IDRE proceed to a payment determination.[41]

---

[39] *Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities*, Centers for Medicare & Medicaid Services (Dec. 2023), https://www.cms.gov/files/document/federal-idr-guidance-idr-entities-march-2023.pdf. (emphasis in original).
[40] 45 C.F.R. § 149.510(c)(1)(v).
[41] *See* 42 U.S.C. § 300gg-111(c)(5)(A).

81. Here, there is no doubt that the IDRE, Keystone, was derelict in its duty to determine eligibility of the Medicare claim submitted by RG Anesthesia. Indeed, given that it is certified by CMS as having expertise in managed care, it defies logic that Keystone could have confused the ineligible Medicare Advantage claim at issue with a commercial insurance claim subject to the NSA, particularly given United's repeated complaints drawing Keystone's attention to this exact issue.

**2) The IDRE's Actions and Ultimate Decision Demonstrate Bias Against United**

82. Keystone's inability to distinguish between ineligible Medicare claims and eligible commercial insurance claims, and its repeated disregard to the medical records showing the claim was a Medicare claim, raises serious doubts about whether it has the requisite expertise to continue to qualify as a certified IDRE. Beyond that, however, there are reasons to question its objectivity and motives.

83. Pursuant to the NSA, IDREs are compensated on a per-claim basis. The commercial insurance plan and the out-of-network provider must each pay a non-refundable administrative fee of $115 when a dispute is initiated. This amount is typically not recoverable even if the IDRE determines that the dispute is ineligible for IDR. In addition, both parties pay an IDRE fee ***before*** the IDRE accepts a dispute and makes the payment determination. The IDRE fee is set by the specific IDRE and depends on the type of dispute, but in 2025 IDRE fees ranged from $375 to

$1,150.[42] Keystone charges $600 for single claim determinations and $800 for batches of 2 to 25 claims.[43] If the dispute is accepted for IDR and a final decision is entered, the party whose offer is selected by the IDRE is refunded its IDRE fee (meaning it is only responsible for its $115 administrative fee).[44] The non-prevailing party is responsible for both its administrative fee and the IDRE fee. From 2022 to 2024, administrative and IDRE fees totaled $885 million (approximately $228 million in administrative fees and $656 million in IDRE fees).[45]

84. IDREs are only compensated when they resolve a claim on the merits.[46] If an IDRE rejects a claim because it is ineligible under the NSA, they receive ***no compensation*** on that claim.[47]

85. This compensation structure thus creates an incentive for IDREs to exceed their authority under the NSA by wrongfully accepting and adjudicating claims that are actually ineligible for NSA IDR and outside their jurisdiction, as was unquestionably the case here.

86. It also incentivizes IDREs to rule in favor of providers because HHS

---

[42] *List of Certified Independent Dispute Resolution Entities*, Centers for Medicare & Medicaid Services, https://www.cms.gov/nosurprises/help-resolve-payment-disputes/certified-idre-list (last visited Jan. 1, 2026).
[43] *Id*.
[44] Upon information and belief, RG Anesthesia received a refund of the IDRE fee it paid Keystone for this dispute.
[45] *See* Note 22, *supra*.
[46] *See* 42 U.S.C. § 300gg-111(c)(5)(F).
[47] See *id.*

statistics show that providers are responsible for initiating all but an insignificant handful of IDR proceedings. Indeed, providers and facilities initiated 478,799 of 478,849 (99.99%) NSA IDR disputes recorded by CMS during the fourth quarter of 2024 alone.[48] Thus, if IDREs reject a dispute as ineligible for IDR or if they select the health plan's rate proposal, the IDRE is biting the proverbial hand that feeds the IDR pipeline. The fact that IDREs are siding with out-of-network providers in 85% of disputes—and awarding four to five times the QPA when doing so—demonstrates that IDREs are biased in favor of out-of-network providers like RG Anesthesia. The bias becomes clearer once one realizes that, of the fifteen IDREs certified by CMS, five, including Keystone, are backed by private equity firms.[49]

87. The fact that Keystone blatantly exceeded its authority and jurisdiction under the NSA in issuing an illegal award—despite repeated opportunities to find the claim ineligible— purporting to require United to pay $1,248.75 on the ineligible Medicare claim described herein is evidence of Keystone's partiality and corruption.

**3) Compliance With the IDRE's Illegal Decision Would Require United to Pay Fraudulent, Abusive and Wasteful Rates That are Inconsistent with CMS's Fee Schedule**

88. As discussed above, United is contracted as a Medicare Advantage plan

---

[48] *Federal IDR Supplemental Tables 2024 Q4*, Centers for Medicare & Medicaid Services, (updated May 28, 2025), https://www.cms.gov/nosurprises/policies-and-resources/reports.
[49] *See* Note 24, *supra*.

administrator with CMS. United's obligations are governed by its contract with CMS and by the provisions of 42 C.F.R. § 422.503-504.

89. United must adhere to certain explicit statutory requirements set forth in Section 503, including specific obligations requiring United to "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS' program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."[50]

90. The amount RG Anesthesia requested, and that the IDRE awarded, for the ineligible claim submitted to NSA IDR is more than ***13 times higher*** than the allowed payment rate established in CMS's Medicare fee schedule. Simply put, RG Anesthesia's claim is fraudulent, wasteful and abusive per 42 C.F.R. § 422.503.

## IV. UNITED HAS NO ADEQUATE RECOURSE UNDER THE NSA

91. As described herein, the NSA IDR system is broken. Providers like RG Anesthesia are intentionally submitting ineligible Medicare and Medicaid-related disputes to IDR in violation of the NSA. And notwithstanding United's objections, IDREs are illegally exercising authority over the ineligible disputes and are issuing awards in favor of providers at indefensibly high amounts that not only exceed the QPA, but also eclipse (oftentimes by many multiples) the established Medicare and Medicaid rates for the services at issue.

---

[50] 42 CFR § 422.503(b)(4)(vi).

92. United has no adequate remedy without judicial relief from this Court. United already attempted to contest the award consistent with the Departments' "Technical Assistance" guidance. The Departments' Technical Assistance details how errors in the NSA IDR process, including when IDREs rule that ineligible Medicaid and Medicare claims are eligible for the NSA IDR process, theoretically can be corrected.[51] But that process is objectively insufficient, as proven by the claim at issue here. It requires that the party raising the error first report it to the IDRE (the party who only gets paid if the dispute is eligible for IDR), who then decides if the error reported is of the type that permits reopening the dispute. In the rare instance that the IDRE acknowledges its error, the IDRE then reports the error to the Departments, who in turn must also determine if the error is redressable by way of this process. If it is, the Departments then reopen the closed dispute to allow ***the same IDRE who made the erroneous eligibility determination in the first place*** to attempt to correct its decision. If the IDRE determines that the claim was not in fact eligible, the IDRE must refund the IDRE fee ***but the administrative fee is never refundable under any circumstances***. Considering the volume of ineligible claims providers like RG Anesthesia are submitting through the NSA IDR process, this

[51] *Federal Independent Dispute Resolution (IDR) Technical Assistance for Certified IDR Entities and Disputing Parties*, Centers for Medicare & Medicaid Services (June 2025), https://www.cms.gov/files/document/idr-ta-errors-after-dispute-closure.pdf

multi-step dispute resolution process is insufficient, particularly given that the administrative fees are never refunded.

## CAUSES OF ACTION

## COUNT I

## DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201, 2202

93. United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

94. There is an actual, substantial, and present controversy between United and Defendant concerning the amounts owed (if any) on the claim described herein. Since Keystone determined the claim in favor of Defendant on September 29, 2025, Radix, on behalf of Defendant, has continually sought payment from United in an amount equal to Keystone's determination. Defendant, through Radix, has sent multiple "urgent" emails to United, demanding payment, citing the IDR determination by Keystone, and threatening "escalation to the Centers for Medicare & Medicaid Services (CMS) for enforcement action" in the event of non-payment.

95. United and Defendant have adverse legal interests.

96. United seeks judgment declaring that Defendant's conduct in initiating NSA IDR for an ineligible claim was unlawful and fraudulent.

97. Without such declaratory judgment, United could be required to pay the award determined by the IDRE for an ineligible claim which never should have been submitted through the NSA IDR process in the first instance.

98. United further seeks a declaration that Medicare and Medicaid claims are not eligible for NSA IDR, that IDREs have no authority or jurisdiction over such claims under the NSA, and that United is not obligated to pay illegal NSA IDR awards issued on ineligible Medicare or Medicaid claims, both retroactively and prospectively.

99. Without such declaratory judgment, there is a real and substantial probability that RG Anesthesia will continue to submit ineligible Medicare and/or Medicaid claims through the NSA IDR process and United may be required to pay IDRE awards, as well as IDRE and administrative fees for these ineligible claims.

100. In addition to declaratory judgment, United seeks an injunction to prevent Defendant from continuing to submit – directly or indirectly – false attestations and initiate the NSA IDR process for items or services that are not qualified for NSA IDR, or from seeking to enforce non-binding awards entered on items and services never qualified for the NSA IDR process.

101. As a direct result of RG Anesthesia's misrepresentations, United has suffered damages in the form of payment of IDRE and administrative fees for a claim that was, at all times, ineligible for resolution through the NSA's IDR process.

United will suffer additional harm if it is required to pay the IDR award for this ineligible claim.

102. To date, RG Anesthesia and its affiliated entities have submitted dozens of claims to the NSA IDR process and are continuing to do so, including the ineligible and fraudulent Medicare claim described herein. United stands to suffer additional ongoing harm if RG Anesthesia is permitted to continue submitting ineligible and fraudulent claims through the NSA IDR process.

103. United and Defendant's rights related to the submission of Medicare and Medicaid claims through the NSA IDR process will be definitively decided through such declaratory and injunctive relief.

104. Without declaratory and injunctive relief, United faces ongoing hardship in the form of being forced to (a) defend its payment of government-mandated amounts on ineligible Medicare and Medicaid claims through the NSA IDR process, (b) pay IDRE awards for ineligible claims, and (c) pay IDRE and administrative fees for ineligible claims for which no payment obligation rightfully exists under the NSA.

## COUNT II

## COMMON LAW FRAUD

105. United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

106. In initiating the dispute at issue here, RG Anesthesia fraudulently attested via an online federal web portal, through its agent Radix, that: "I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge . . . the ***item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process***." (emphasis added). This attestation plainly misrepresented that the underlying claim was within the scope of the NSA IDR process.

107. RG Anesthesia submitted the IDR notice of initiation in the dispute with full knowledge of, or at the very least with reckless disregard to, the falsity of this attestation. From the patient's insurance card, the PRA United submitted to RG Anesthesia, the plain text of federal laws and regulations, CMS publications and resources, RG Anesthesia's preparation of IDR initiation forms and notices, RG Anesthesia's participation in the IDR process, and the specific objections to eligibility that United submitted to RG Anesthesia and the IDRE, among other sources, RG Anesthesia knew that the dispute it was initiating was ineligible for the IDR process.

108. RG Anesthesia nevertheless submitted these false attestations and did so with the intent that the IDRE and United rely on them. According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including RG Anesthesia's false attestations of

eligibility—"to determine whether the Federal IDR process applies."[52] Even though United contested eligibility, RG Anesthesia's deliberate misrepresentation to the IDRE, on which the IDRE relied, forced United to rely on the misrepresentation because once the IDRE determined the dispute was eligible, United had no choice but to expend resources to proceed with the process, submit a final offer, and watch helplessly as the dispute continued to a final payment determination. Any other approach would have resulted in a default award against United for an amount many times the allowed CMS rate.

109. RG Anesthesia's false attestations of eligibility pertain to material facts in the NSA IDR process because they go to the heart of the IDRE's jurisdiction to even hear the dispute.

110. RG Anesthesia submitted the false attestations to receive a windfall for itself, namely, IDR payment determinations in favor of RG Anesthesia and against United regarding items or services that it knew were ineligible for resolution through the NSA IDR process.

111. As a direct result of these misrepresentations by RG Anesthesia, United has suffered damages in the form of payment of IDRE and administrative fees for a claim that was, at all times, ineligible for resolution through the NSA's IDR process.

[52] 45 C.F.R. § 149.510(c)(1)(v).

United will suffer additional harm if it is required to pay the IDR award for this ineligible claim.

112. To date, RG Anesthesia and its affiliated entities have submitted dozens of claims to the NSA IDR process and are continuing to do so, including the ineligible and fraudulent Medicare claim described herein. United stands to suffer additional ongoing harm if RG Anesthesia is permitted to continue submitting ineligible and fraudulent claims through the NSA IDR process.

113. United seeks damages and injunctive relief to enjoin Defendant from continuing to fraudulently submit false attestations and initiating the NSA IDR process for items or services that are not qualified for NSA IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for the NSA IDR process.

## PRAYER FOR RELIEF

Wherefore, Plaintiff United respectfully requests that relief be entered in its favor as follows:

A. Declare that Defendant's conduct in initiating NSA IDR for the ineligible Medicare claim described herein was unlawful and fraudulent;

B. Declare that Medicare- and Medicaid-related claims are not eligible for NSA IDR;

C. Declare that IDR awards issued on unqualified items or services are non-binding and are not payable;

D. Enjoin Defendant from continuing to submit false attestations and initiate the NSA IDR process for items or services that are not qualified for NSA IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for the NSA IDR process;

E. Award compensatory, punitive, and exemplary damages;

F. Award costs, attorneys' fees, and interest;

G. Grant such other and further relief as the Court deems just and proper.

Dated: January 30, 2026

Respectfully submitted:
*/s/ Adam J. Sinton*
Adam J. Sinton
Ga. Bar No. 235458
Scott P. Kerew
Ga. Bar No. 416629
SINTON SCOTT MINOCK & KEREW
3438 Peachtree Rd, Ste. 925
Atlanta, GA 30326
Telephone: 470-333-3801
Email: asinton@ssmklaw.com
skerew@ssmklaw.com

David C. Tolley (*pro hac vice application forthcoming*)
William J. Trach (*pro hac vice application forthcoming*)
U. Gwyn Williams (*pro hac vice application forthcoming*)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Email: david.tolley@lw.com
william.trach@lw.com
gwyn.williams@lw.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D of the Northern District of Georgia, I hereby certify that the foregoing submission to the Court complies with the font and point selections prescribed by Local Rule 5.1B and uses 14-point Times New Roman font.

*/s/ Scott P. Kerew*
Scott P. Kerew

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record. This document will also be served by an authorized process server.

*/s/ Scott P. Kerew*
Scott P. Kerew